Filed 7/27/16  P. v. Sanchez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E064060 |
| v. | (Super.Ct.No. RIF1104183) |
| ALBERTO ROSES SANCHEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  John D. Molloy, Judge.

Affirmed.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

### FACTUAL AND PROCEDURAL HISTORY

A.      PROCEDURAL BACKGROUND

On August 30, 2012, an information charged defendant and appellant Alberto Roses Sanchez with attempted willful, deliberate and premeditated murder of Vincent

1

Varvaro under Penal Code sections 664 and 187, subdivision (a) (count 1); and attempted willful, deliberate and premeditated murder of Douglas Ruttan under Penal Code sections 664 and 187, subdivision (a) (count 2). The information also alleged that during the commission and attempted commission of both counts, defendant personally and intentionally discharged a firearm and proximately caused great bodily injury or death to another person, not an accomplice, within the meaning of Penal Code sections 12022.53, subdivision (d), and 1192.7, subdivision (c)(8). The information further alleged that defendant had suffered three prior felony convictions within the meaning of Penal Code sections 667.5, subdivision (b).

A jury trial commenced on May 21, 2015. The trial court granted defendant's motion to bifurcate the priors from the jury trial. On May 27, 2015, defendant waived his right to a trial on the priors and admitted all three alleged priors. On May 29, 2015, the jury found defendant guilty of counts 1 and 2, and that both counts were willful, deliberate and premeditated. The jury also found the associated enhancements to be true.

On June 29, 2015, as to count 1, the trial court sentenced defendant to life in prison with the possibility of parole, plus an indeterminate sentence of 25 years to life for the firearm enhancement, to run consecutive. As to count 2, the trial court imposed a second life sentence with the possibility of parole with an additional 25 years to life for the enhancement, both to run consecutive to count 1. Moreover, the court imposed an additional year for each of the three priors to run consecutive. Thereafter, the court awarded defendant credits, and imposed fines and fees.

On July 15, 2015, defendant filed his timely notice of appeal.

B.	FACTUAL BACKGROUND

In July 2011 Varvaro lived in Banning on Wesley Street. During the late evening hours of July 25, 2011, and into the early morning of July 26, 2011, he was home with his friend, Ruttan. They were in the living room; they were using methamphetamine and marijuana.

Varvaro did not own the house. He looked after the homeowner's horses, in exchange for a place to stay. Ruttan was also staying at the house. Defendant was a friend of the homeowner's; he sometimes stayed at the house and did chores. Varvaro had done drugs with defendant at the house. On the night of the incident, the homeowner was at home in her bedroom; she did not come out.

During the evening of July 25, 2011, defendant came to the house on Wesley Street. He asked Varvaro if he would sell defendant some marijuana. Varvaro told defendant he could not sell him any marijuana—instead he gave defendant some. Varvaro and Ruttan were sitting in the living room when defendant arrived. Varvaro did not know defendant was coming to the house. Shortly after Varvaro gave defendant the marijuana, defendant pulled out a gun. Varvaro did not where defendant retrieved the gun from. Defendant looked irritated and agitated; Varvaro did not know why.

Defendant did not say anything. He aimed the gun at Varvaro and fired, but the gun jammed. Defendant was about two feet away from Varvaro. Varvaro said to defendant, "You shouldn't aim a weapon at what you don't intend to kill." Defendant turned around, unjammed the gun, turned back to Varvaro and fired the gun at him, hitting him in the jaw. Defendant then aimed the gun at Ruttan and shot Ruttan in the

3

head.  Varvaro made his way to the back door.  Defendant followed Varvaro, put the gun to Varvaro's right arm and fired again.  Defendant told Varvaro that if he said anything, Varvaro was "going to get got."

Varvaro called 911.  The police arrived and not knowing what had transpired, shackled victims and airlifted them to a hospital.  Ruttan was unconscious.  Varvaro spent many days in the hospital; he received reconstructive surgery on his jaw, which had been shattered.  At the time of his testimony at trial, Varvaro continued to suffer problems with his eye.

Varvaro did not know why defendant would want to shoot him and Ruttan.  Varvaro thought it possibly was because of gas money that he owed defendant but he was not certain, because when defendant arrived at the house, he did not ask Varvaro for money.  Varvaro did not remember a short-haired white female dressed like a man come into the house with defendant.

Ruttan was living at the Wesley house in July 2011.  He remembered being home with Varvaro the evening he was shot.  He did not remember if they were doing drugs. They were in the living room talking, when he heard a gunshot.  He felt something hit his head and he slid off his chair onto the floor.  He blacked out.  Ruttan did not remember another person being in the room with him and Varvaro.  The shot came from behind him because he was hit in the back of his head.

Four years after the incident, Ruttan lived with his daughter.  He could not drive, had poor balance, and bad memory.

4

Ruttan did not see the person who shot him; he did not know who shot him. At trial, Ruttan did not recognize defendant; he did not think that he had ever seen defendant previously.

Shawna Gonzales had known defendant since childhood. Defendant called Gonzales late in the evening on July 25, 2011, and asked her to pick him up from his mother's home because he was mad; he needed a ride. Gonzales picked up defendant in her red Ford Ranger truck. Defendant wanted her to take him to another friend's house where he could stay the night so she drove him to Banning. When they arrived, there was a man outside; defendant asked the man if his friend was there, but was told she was not. Gonzales and defendant left and went to another location where defendant thought he could spend the night.

Gonzales had never previously been to the second home. She stayed in the truck while defendant went inside. Defendant came out, said he was not able to stay there, so they headed back to defendant's mother's house. On the way, they passed the Wesley house in Banning. Defendant asked Gonzales to stop so he could ask if he could stay there. Gonzales had never been to the Wesley house; she did not know who lived there.

After they pulled up, defendant exited the truck saying said he would be right back. Defendant was in the house for five to 10 minutes. Defendant and another man came out and asked for a cigarette. Gonzales told defendant she wanted to leave and would give him a ride to his mother's house. He asked her to give him a couple of more minutes so she reentered her truck. Ten to possibly 20 minutes later, defendant ran from the house, jumped into the truck, and told her to leave.

5

Gonzales told police she heard what "sounded like a bang," before defendant came running out. At the time, she did not know it was a gunshot. When defendant got into her car, he seemed panicked and told her "go, go, go." They left immediately. He was "flipping out" in the car; she knew something was not right. She kept asking what had happened and defendant eventually told her that he had shot someone in the head.

At that point, Gonzales was scared and wanted to get away from defendant because she did not know what would happen. She dropped him off a mile or two from his mother's house and went home. When she arrived home, she woke up her roommate and told her what happened. Then Gonzales called her mom. Her mom said to come to her house and they would call the police. The police came and took Gonzales to the police station.

Robert Merritt was a retired detective with the Banning Police Department. On July 25, 2011, he had been an officer for 18 years. Detective Merritt tried to interview Varvaro and Ruttan at the hospital shortly after the shooting but was unable to speak to either of them because Varvaro was heavily sedated and Ruttan was being prepared for emergency brain surgery.

Detective Merritt returned to the hospital on July 27, 2011. The doctor provided Merritt with bullet fragments retrieved from Ruttan's brain. Detective Merritt returned later that day to speak with Varvaro. The detective said that Varvaro looked terrible and had trouble speaking because of the injuries to his jaw and mouth area. Detective Merritt showed Varvaro a photo lineup; Varvaro identified defendant as the shooter. Detective

6

Merritt was able to speak to Ruttan on August 4. Ruttan was still in the hospital. The conversation was not coherent because Ruttan could only say a few words.

At trial, Detective Merritt did not recall Varvaro telling him that Varvaro knew or had seen the person who shot him before the shooting. Varvaro did not tell the detective about using drugs that day.

Defendant testified on his own behalf at trial. He said he did not shoot either victim. On July 29, 2022, he heard from his girlfriend, Adi Snyder, that someone was accusing him of shooting two people. Defendant said he was with his daughter on the evening of July 25 until the next day. Defendant testified that Gonzales was bisexual and had previously had a relationship with defendant's girlfriend. He thought that might be why Gonzales would tell the police that he shot two people. Defendant said he was not at the scene of the shooting; he does not otherwise know why Gonzales would fabricate the story.

Defendant had several felony convictions. In 2003, he was convicted of possession of a dangerous weapon, a screwdriver. In 2005 and 2006, he was convicted of being a felon in possession of a firearm. At the time of the shooting, defendant was on parole.

## DISCUSSION

After defendant appealed, and upon his request, this court appointed counsel to represent him. Counsel has filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738 setting forth a statement of

7

the case, a summary of the facts, and potential arguable issues, and requesting this court to undertake a review of the entire record.

We offered defendant an opportunity to file a personal supplemental brief, but he has not done so. Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, we have independently reviewed the record for potential error and find no error.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER

J.

We concur:

RAMIREZ

P. J.

McKINSTER

J.

8